The next matter, number 23-1575, BioPoint, Inc. v. Andrew Dickhaut, et al. At this time, would counsel for the appellant please introduce himself on the record to begin. Good morning, Your Honors. My name is Dana Zakarian. I represent the appellants, Andrew Dickhaut and Catapult Staffing. Your Honor, may I please reserve three minutes for rebuttal? You may. This statute, chapter 93, section 42 at sequence, was implemented in 2018 to create one uniform set of laws that would govern trade secrets in the Commonwealth. To that end, the statute includes a section 42F that provides that the statute, quote, shall supersede any conflicting laws of the Commonwealth providing civil remedies for the misappropriation of a trade secret. It goes on to further state that the statute does not affect, quote, other civil remedies to the extent that they are not based upon misappropriation of a trade secret. Counsel, just referring to this as the preemption argument, which I think is what you were going to focus on, did you ever squarely raise that argument to the district court until after it had entered its judgment? Your Honor, we raised it before the bench trial, we raised it during the bench trial, and we raised it after the bench trial. But specifically on the preemption, using the words, you know, to very clearly say to the district court, if it's going to be based on trade secret, then it's preempted by this statute and you can only double and you can only double in these circumstances, etc. Was that specific argument ever raised? The argument that I said to the court, Your Honor, was that if it's a trade secret, then you must find malice to award attorney's fees or multiple damages. And the words I used were predicate. Counsel, counsel, that's a bit evasive. You moved to dismiss the Muta charge, the Muta claim in the complaint. You did not at that time raise the, I prefer the word, supercession, because preemption is a term of art in federal court. You simply did not, at the district court, never raised, never addressed the issue because it was not raised. You then later do argue to the court that your claim was not preempted. You were entitled to a malice finding, but you never made this particular argument to the court before its ruling. Isn't that correct? That is not correct, Your Honor. Okay, when did you make the specific argument? I just said, Your Honor, we made the specific argument during the bench trial, during the entire time. And if I may, with the motion to dismiss... No, no, when did you first articulate the precise supercession argument that you now want us to rule on? Your Honor, it's one and the same. If the law is you must find malice in order to award this, if it's a trade secret claim, I said that. The problem is that their 93A claim went broader than trade secrets. In the complaint, they specifically alleged three bases for a 93A violation. Theft of trade secret, tortious interference, which could have been based on confidential information, and theft of confidential information. So your argument is just by talking about the requirement for the malice finding you were making. That is correct, Your Honor, because in order to be superseded, there has to be a finding that the claim is based on a theft of trade secret. Remember, I argued up until the bitter end, and still maintain today, none of this stuff is a trade secret. That was the proposed findings we gave the court. We said, the jury got it wrong. None of this stuff is a trade secret. Your Honor should make that finding. Had the court said, there's no trade secret, but I'm going to find 93, I wouldn't be here. Had the court found malice and awarded just attorney's fees, I wouldn't have this argument because the two laws would not conflict. Had the court found malice and awarded double damages, again, I wouldn't have this argument because the laws would not conflict. What made them conflict is when the court said, everything is based on a trade secret, there's no malice, and I'm giving you attorney's fees and triple damages. At that point, we raised it with the court. I would also point out, Your Honor, and this is in the record on pages 1799 to 1800. When we made our proposed findings of fact, BioPoint did a reply. In their reply, they specifically accused me of misstating the law. The subheading is, the defendants have misstated the law, and here's what they said. Defendants argue that BioPoint should not get its attorney's fees based on the standard for recovery under the trade secret statute. To be clear, attorney's fees are automatic when there is a violation of a Chapter 93A. Regardless of what the trade secret statutes require, BioPoint is entitled to its fees on that basis alone. I was not given a sir reply. I was promised by the court on the record, RA 1653, that we would have a hearing, so I could have addressed that. But what they told the court was 100% wrong. What I told the court was 100% right. When the court made its findings, adopted what BioPoint said, and did this, the first opportunity I had to say was, okay, you made your findings, you applied the law incorrectly. I did that with my post-trial motion, which the rules provide that I can do. They give me 30 days after the entry of judgment. By the way, the court made its findings and issued judgment the next day. It's not like I had an opportunity to bring this up before. But the matter still was with the trial judge. He still had to decide the amount of attorney's fees, he still had some other post-trial motions to amend the judgment before him. I raised this, I gave him the opportunity, and the court did not take it. Instead he said, you waive this. We did not waive this. Counsel, could I ask you a few questions about the damages award? How much of the damages award was a result of the district court's kind of one-line ruling that he was applying the Head Start Doctrine and then not citing Massachusetts law, but citing an unlimited definition from Rhode Island law? First, how much of the damages specifically do you say were attributed to the inappropriate use of the Head Start Doctrine, just as a factual matter? $1.6 million approximately, Your Honor. It was the Vedanta profits, and then the court tripled it. Why is that 1.6? I thought it was 1.3 for the Vedanta profits. I apologize, Your Honor. The total award was 1.3 million for the Vedanta profits. I apologize, Your Honor. And then he tripled it. Okay. Now, why would... Sorry. Let me go at this another way. After he made his ruling, you said, in essence, Judge, give us a new trial. You've committed errors of law. Under Jet Spray, the Massachusetts Head Start Doctrine only applies to manufactured goods. It doesn't apply to this sort of stuff. But that is not the argument you just made to us, because why is it that the Vedanta award, in your view, is precluded by the narrower definition of the Head Start Doctrine in Massachusetts? Your Honor, the Head Start Doctrine is one of a timing issue. It says that if a product hits the market, how long would it take the competitors to reverse engineering? And if they already have the secret formula for that product and they can skip that time, how much is it? That analysis was never underwent by the court at all. He never once said, it would have taken you this amount of time to get the Vedanta client and get that business. Instead, he just said, basically, you guys aren't capable of being a staffing company, regardless of the fact that you do this all over the country. You've been doing it for years. No, no, no. Isn't the rationale... You weren't in the business of providing biotech high-level employees. You never would have looked to Vedanta. It was precisely because of this egregious breach of the duty of loyalty by the wife and sharing trade secrets that you focused on Vedanta? Isn't that what underlies the district court's award here? No, Your Honor. Because you have to understand that the Vedanta relationship came about because Andrew Dickow went to high school with Jeff Ottenreuth, who was the principal at Vedanta. In fact, Mr. Dickow was doing business with Mr. Ottenreuth when he worked at Moderna. When Mr. Ottenreuth left to work for Vedanta, that is why Mr. Dickow went over there and started pitching to them. The work that they were pitching to Vedanta in the very beginning were low-level people. That's what the majority of what they staffed was. Can I go back to Judge Lynch's original question just on the damages award again? I'm just trying to understand your answer that the entire $1.3 million would disappear. I thought that it was pretty clear that at least several of the people whose placements rolled up into the $1.3 million were people that Ms. Addis gave to her fiancé. Why isn't at least some of that $1.3 million accurate and permitted, even if we agree with you on Head Start and the other arguments that you're making? It would be, Your Honor, it would be about $65,000 of the $1.3 million. Why is that? There were two consultants, Chris DaCosta and Stephen Hallward. The other medical directors at the right position placements? Correct, Your Honor. There were no other findings of any other consultants at Vedanta. But what does the $65,000 represent that you're telling me right now? Those are catapults gross profits for those two individuals. If you took it down to net, I know we did the math in the brief, you take out about 40% for the commissions. That's what this would be reduced to, not $1.3 million. And that's taking out Ms. Fertazzi? Am I getting her name correct? Because of your arguments about double counting, so you've taken her out? Correct. Our profits on Ms. Fertazzi, I believe it was somewhere in the mid $50,000 range. When I've given the numbers in the brief, I apologize, but it would be, you're talking about $100,000 even if you add Ms. Fertazzi in, as opposed to $1.3 million. But if we disagree with you about what the record shows about how the Vedanta relationship  shows that it was, it would not have happened but for the alleged trade secret secret misappropriation, then I take it this whole limitation argument just doesn't matter. Under the unjust enrichment theory, the entire amount would be appropriate. No, that's not correct. Okay, why is that not correct? Because the statute says that the profits must be attributable to a use of a trade secret. The vast majority, almost half the money from Vedanta, $500,000 was for people who clean rat cages. No, I just said, if we disagree with you about what the record shows on that, and if we say that the record shows that the relationship never would have happened but for trade secret misappropriation, then I take it the limitation you're talking about doesn't count. No, Your Honor, I don't think you can view trade secret misappropriation that way. I think you have to look at what was the secret, what were the profits. And if you could, then it would be very easy just to say any business you do with anyone, regardless of whether it relates to their trade secret, you wouldn't have gotten that business but for our trade secret, so we get everything. That's not what disgorgement is meant to do. It's meant to return the profits obtained from the trade secret. I don't think there's any basis anyone could say you wouldn't have gotten this relationship. In fact, we called Mr. Okay, so that wasn't my question, so I'm going to try it one more time. If we say that the record does show that the relationship itself with Vedanta would not have occurred but for trade secret misappropriation, then what's the result? Then I suppose, Your Honor, you could determine that all of the profits were attributable to that trade secret. I don't think that's what the record shows. Fair enough. But it could not be tripled and there wouldn't be attorney's fees. Thank you. Thank you, Your Honor. Thank you, counsel. At this time, if counsel for the appellee would please introduce herself on the record to begin. Good morning. May it please the court, Alison Anderson for the Plaintiff Appellee, Biopoint, Inc. Chapter 93A is designed to protect against the exact type of unscrupulous business conduct that occurred in this case. Over a period of years, defendants intentionally misappropriated all aspects of Biopoint's information to build a competing business. Counsel, we're well aware of the record. We're well aware of what happened. Do we have a MUTA issue in this case or do we not? And if so, what is the issue and what is your argument on it? We do not have a MUTA supercision issue in this case for at least four reasons. First, on the timeliness issue, the district court found in its decision that the misappropriation in this case began in early 2018 and continued thereafter. But counsel, didn't you argue the exact opposite point below? And I think your opposing counsel says you're judicially stopped from arguing otherwise to us now. I think below you expressly said that there was not a continuing misappropriation in your case. We were aware of various acts of misappropriation, but discovery had not yet occurred and we hadn't yet been able to appreciate the way in which the trade secrets were interconnected with one another. In other words, through the course of discovery, which is principally text messages between defendants, emails of defendants, we were able to see that the individual acts of misappropriation that we were aware of at the time of the dismiss hearing were actually interconnected with one another in a way that set up the scheme that we presented to the jury and to the judge. And in fact, the court... Counsel, without getting into all of the facts, does judicial estoppel actually apply when there is a motion to dismiss and you are permitted to make alternate pleadings in your complaint and you haven't been through discovery and the precise issue, say, of the retroactivity of Muta is not raised in the motion to dismiss? Does judicial estoppel actually apply in those circumstances? To your first point, Your Honor, it doesn't apply to our taking the position that we were in discovery, what actually happened in this case. If you're alternatively asking whether estoppel should apply to defendants raising this Muta issue at this very late stage of the litigation, we would... No, you misapprehended my question. That's okay. Keep moving. So the first issue is the timeliness issue, which is the misappropriation began before 2018. The district court found as such, and if this court was to say that Muta applies in this case, they'd essentially be having to reverse the district court's factual findings, which I'll note appellants do not actually appeal in this litigation and there would be a very high burden, as Your Honor noted earlier today, in reversing those findings by the district court. If Muta doesn't apply, then there's no issue of superstition because the Chapter 93A award stands on its own. The second issue relates to the waiver issue, which is defendants very late waived this issue to the point that biopause has been prejudiced. I'm sorry. Can we go back? Are you saying that because you're not estopped and because of the timing of your opponents raising the Muta issue, this court does not have to decide any of the Muta issues because in essence there has been waiver or forfeiture by your opponent and we should just leave these issues for the Massachusetts court to resolve? That is correct, Your Honor. Okay. And so you say Muta drops out of the case. At that point, you just look at 93A. That's correct, Your Honor. The third reason, and I'll submit that what Your Honor just identified is this timeliness issue and this waiver issue. It resolves it and the court does not proceed with it. But to the extent the court decides to reach this issue on the merits, there still is not a Muta superstition issue based on the nature of the claim at issue in this case. You just heard from my opponent that Biopoint's Chapter 93A claim is based on more than trade secret misappropriation. It involved misappropriation of confidential information, it involved tortuous interference, and it involved other types of unscrupulous bad business conduct. It was these four categories of information which are reflected in the district's court's detailed 29-page decision that serve as the basis of the Chapter 93A claim and the award that followed. If we were to actually adopt defendant's worldview in this case, essentially we'd be presented with illogical alternatives that would make no sense. So on the one hand, it would be that if there was a Chapter 93A claim that involved more than trade secret misappropriation, somehow we would have to carve out that which was just the trade secret piece of it, and that would effectively distort the remaining aspects of the Chapter 93A claim. And I can give you an example here, which is in one instance, Ms. Addis shared trade secret information in the form of a competitive contract document that contained Biopoint's competitive strategy. On another occasion, she sat down and taught Catapult precisely how to conduct searching for placements. That was a type of unscrupulous business conduct. Those two facts, which the district court reflected in its 29 page decision, were the start of what ended up becoming a long and multi-pronged scheme in which they were able to convince Vedanta to hire them and then to service their account using Biopoint's information. There'd be no meaningful way to untether those facts from one another and decide that one aspect of the case involves trade secret misappropriation and another does not. And indeed, that would defy the very purpose of the Chapter 93A statute, which is intended to look at the overall bad faith conduct of a particular business. It's looked at based on the totality of the circumstances. So the scenario that defendants are positing to you today would essentially gut the Chapter 93A statute by indicating that any time a claim even involved an aspect of trade secret misappropriation, the remedies available under that statute would no longer apply. And it can't possibly be the case that the Massachusetts legislature intended for that type of result. But that would also be true, would it not, with respect to a claim of unjust enrichment? Based on the argument that you say can't possibly be true, it would carve out trade secret, any role that trade secret misappropriation played in an unjust enrichment claim? Yes, Your Honor, absolutely. This directly answers the question you asked my opponent a few moments ago, which is if the court concludes that but for the taking of the trade secret and confidential information in this case, defendants wouldn't have obtained the Vedanta account. It is that but for that information that is true and therefore all profits they earned flowed from their taking of that information. And this court should conclude that. But importantly, the district court concluded that. And as I said before, those facts are not on appeal today. Counsel, so are you arguing that the district court's reliance on the Head Start doctrine or measure of damages, however you want to phrase it, doesn't matter? I think it was a framework by which the court analyzed the issues in this case. The Head Start doctrine exists under Massachusetts law and the Jesperi decision. But it was a framework in which the court looked at how was it that defendants who had no prior experience in the life sciences space managed in a year's time to convince that client to hire them and then ultimately resulted in a multimillion dollar deal for Vedanta? How did that occur? And the court looked at a series of facts. As I said, this was a multi-pronged scheme between defendants in order to use BioPoint's information. And the Head Start doctrine is essentially a framework for thinking about that. Counsel, counsel, counsel, can we go back to the precise question you were asked? You've just said, look, there were four different bases for the 93A damages. And in reply to Judge Howard, you said, and unjust enrichment isn't touched by the defendants' argument. So why does it matter whether the defendants' argument is true or not? Judge, use the phrase Head Start if all of those independent grounds support the Vedanta verdict that the court delivered here. Your Honor, it doesn't matter, to be frank. What I mean to say is it was simply a framework to analyze the issues. But it was a framework that may have otherwise induced error. And the failure to cite Jet Spray, you all didn't cite Jet Spray. You cited a Rhode Island case not subject to the Massachusetts law strictures to the court, and the court just adopted it. You didn't cite Massachusetts law to the court. So one thing we have to figure out is if that was error and whether it actually matters in this case. It may not matter because of the arguments you just made. But I don't understand why you didn't cite Massachusetts law to the district court judge. Your Honor, the Head Start doctrine in the Jet Spray decision, I appreciate that Your Honor is saying that case wasn't cited to the district court, but it was considered. No, you cited a Rhode Island case which is far broader than Massachusetts law. And it's true your opponent then cited Jet Spray. But weren't you under an obligation to tell the judge what the correct law was if you were going to rely on it? Your Honor, yes, we were responsible for citing the correct law to the judge. But I would submit to you that the description of the law we submitted to the judge was indeed accurate. We were asking the judge to analyze this case under a framework that involved Head Start. But we weren't indicating that you needed to satisfy the Jet Spray standard in order for the judge to reach the ultimate conclusion that there was a Chapter 93A violation. We were simply setting up a framework for the judge in which to consider the issues, which is that but for defendants having taken and used BioPoint's information over a period of year, they would have never obtained the Vedanta account. That was the framework in which we were providing to the judge. So you're saying that the Massachusetts Head Start doctrine, the way it's been developed under Massachusetts law, would apply here? What should we do then? It would have no impact whatsoever on the ruling. The Chapter 93A, that's the question here. What about the ruling makes it clear that it would have no impact? Because the judge absolutely talked about the notion of a Head Start. He certainly did, but I would submit he did so the same way that BioPoint did, which is into setting up a framework in which to think about the Chapter 93A violation. The judge's decision sets out what the elements of wrongdoing are in order to satisfy Chapter 93A, and then walked through in detail throughout the record the series of events that defendants engaged in that constituted the type of egregious conduct here, which I would submit to you as a textbook example of Chapter 93A, and the fact that the court used the Head Start framework in no way impacts the outcome of the case. Did you argue the Head Start doctrine directly applies, or did you say by analogy Head Start is a way of thinking about the case in terms of what you said to Judge Stern when you asked him when you referred to this doctrine? We used the Head Start doctrine as a framing in which to think about this case. I don't think we would have called it an analogy, but simply as a framing. But the core focus of our submissions to Judge Stern focused on whether or not defendants violated Chapter 93A, and our analysis flowed from an assessment of the ways in which their conduct violated that statute in particular. We were in no way reliant exclusively on the Head Start doctrine as the basis for satisfying Chapter 93A. Counsel, why isn't there at least double counting on the Fertazzi damages, lost profits and disgorgement awards here? So the damages determined by the jury related to the lost profits that Biopoint lost as a result of missing a placement opportunity with its prospective client, Shire, that is a distinct harm from the unjust enrichment damages, which was to disgorge from defendants the profits that they had wrongly obtained. But isn't there a Massachusetts case law that makes it pretty clear you can't get both of those things? No, Your Honor. I would submit that where the remedy is intended to remedy different harms, then both are recoverable. I'll give you an example. Defendants could have never placed third Fertazzi and its damages would still be fully recoverable to Biopoint because the court found that but for the taking of Biopoint's information, it would have never earned or sustained that account. So all profits flowing from Vedanta were wrongly obtained and thus disgorged from defendants. Separate from that, there's the issue of Fertazzi's placement, which is that Biopoint had a prospective opportunity to place Dr. Fertazzi with its client, Shire, and but for defendants' interference with that opportunity, Biopoint would have proceeded to earn the $312,000. I'm just trying to understand the first part of your argument. You're saying even if Catapult had never placed Fertazzi, you'd have the same damages, but how could that be because the disgorgement represented the placement of her. It couldn't have been the same. My point is merely to say that the sum total of the profits that they earned from the Vedanta account, those were the profits that were wrongly obtained. Right, but the sum total would have been lower if they hadn't placed Fertazzi, which is exactly the double-counting point. It would have been lower, but it's remedying different harms. One was for their taking of their information and wrongly obtaining that account in the first instance, and separate and independent from that was the tortious interference finding that Biopoint lost an opportunity to place this particular provider with its prospective client. I'm having trouble understanding. What are the dollar differences between the two? The jury award for Dr. Fertazzi was $312,000. Your Honor, I would need to look directly at the record on the profits defendants earned for Fertazzi, but I think it is something less than $100,000, but it's in the record, and I could provide that to the court. Anything further, Judge Lynch? No. Thank you. Thank you, Counsel. At this time, the Counsel for the Appellants can please reintroduce himself on the record to begin. Good morning. Again, Dana Zakarian on behalf of Appellants. A couple points in rebuttal. First, there is no way that this Court should ever find now on appeal, after the appellate briefing is fully closed, that MUTSA does not apply. It goes beyond judicial estoppel. We tried the case to the jury on MUTSA. We had a bench trial on MUTSA. It affected the jury instructions. It affected everything. There's no way you could now say this was all some continuing misappropriation. That's not even what the District Court found. Nowhere in his decision does he say this is a continuing misappropriation. He says, he lists out 20 different things. He says, well, I find that you wouldn't have been able to get it and you wouldn't have been able to service the account. You wouldn't have been able to do all this except for all these 20 things that happened over time. The BioPoint database, by the way, this Crelate database they talk about, it's not a static document. It's not like any of the cases you see with continuing misappropriation where someone leaves a company, walks over there with a customer list, and then continues to use it. This is a living, breathing database. Some of the consultants that they're saying we took information on probably weren't even in the database at the time of 2018 pre-MUTSA. They get added over time. Whether someone's looking for a job in 2018 and that's their trade secret might be completely different in 2019. They may already have a job. So I don't think you could ever look at this as a continuing misappropriation. BioPoint didn't raise this to the lower court. They didn't even raise it in their appellate argument, in their briefs. This came up because the court raised it. And we pointed out the reason nobody argued this is because in the beginning of the case we moved to dismiss and they said, no, no, it's all separate and discreet. Can you respond to the judicial estoppel argument or expand on it? It's your argument. Why you heard some of the discussion that maybe just doesn't apply here. Sure. If BioPoint had taken the position in the beginning of the case that this was one continuing misappropriation, that would have framed how the case proceeded. It would have framed how we argued it. It would have framed the jury instructions. Remember, malice, which is an issue we asked to go on the jury verdict slip and the judge wouldn't put on it. It's an issue that we all argued to the judge during the findings. That only comes up under MUTSA. MUTSA has a tighter definition of a trade secret standard. MUTSA has requirements for discovery. You're going to say a trade secret, you have to identify it. If the court is inclined to engage in that argument, you'd have to throw everything out and give us a new jury trial. Because the issue of misappropriation is a jury right issue. We absolutely had a jury right on that. Even Judge Stern said that. That's why he had the jury decide whether there was misappropriation. If we were known now they were going to argue continuing misappropriation, we would have said that's another reason why the jury verdict has to list out what the trade secret was. Because when was it taken and was it continued to be used? And the judge didn't address any of that in his findings, so this court shouldn't touch it now, respectfully. Any further questions? Judge Lynch? No, thank you. Thank you very much. Thank you, Your Honors.